IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SANTIAGO TAPIA, | ) | |
| | ) | |
| Claimant, | ) | No. 14-cv-1915 |
| | ) | |
| v. | ) | Jeffrey T. Gilbert |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Santiago Tapia ("Claimant") seeks review of the final decision of Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 7.] Claimant has moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment. [ECF No. 10.] The Commissioner has done likewise. [ECF No. 18.] For the following reasons, Claimant's motion for summary judgment is granted, and the Commissioner's motion is denied. The decision of the Commissioner is reversed, and the case is remanded to the Social Security Administration ("the SSA") for further proceedings consistent with this Memorandum Opinion and Order.

## I. PROCEDURAL HISTORY

On November 29, 2010, Claimant filed an application for SSI, alleging a disability onset date of October 31, 2008. (R. 153.) The claim was denied initially on March 30, 2011, and upon reconsideration on August 18, 2011. (R. 101, 107.) On August 30, 2011, Claimant requested a

hearing before an Administrative Law Judge ("the ALJ"). (R. 111-113.) The requested hearing was then held on November 14, 2012. (R. 48-92.) At that hearing, Claimant, who was represented by counsel, appeared and testified. *Id.* A vocational expert ("the VE") also appeared and testified. *Id.*

On December 6, 2012, the ALJ issued a written decision. (R. 19-31.) In the decision, the ALJ went through the five-step sequential evaluation process and ultimately found Claimant not disabled under the Act. (R. 19.) At step one, the ALJ found Claimant had not engaged in substantial gainful activity ("SGA") since November 29, 2010. (R. 21.) At step two, the ALJ found Claimant had the severe impairments of status post lumbar spine surgery, herniated disc in the lumbar spine, herniated disc in the cervical spine with cervical spine radiculopathy, headaches, hypertension, depression, anxiety, and sleep apnea. *Id.* At step three, the ALJ found Claimant did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). (R. 22.)

Before step four, the ALJ determined Claimant's residual functional capacity ("RFC"). (R. 24.) The ALJ found Claimant could: (1) understand, remember, and carry out short, simple, and repetitive instructions and (2) sustain attention and concentration on short, simple, and repetitive instructions for two hours at a time and for eight total hours in the workday. *Id.* The ALJ found Claimant capable of using judgment in making work decisions related to short simple, repetitive instructions. *Id.* But the ALJ found Claimant was only capable of occupations with set routines and procedures, and with no more than a few changes during the workday. *Id.* The ALJ found Claimant further limited to jobs that did not involve fast-paced production work. The ALJ found Claimant could not have more than superficial contact with the public on routine

matters or more than occasional co-worker contact and supervision. *Id.* The ALJ further limited Claimant to jobs that do not require more than: (1) occasionally lifting/carrying ten pounds, (2) frequently lifting/carrying less than ten pounds, (3) sitting six hours during an eight-hour workday, (4) standing/walking two hours during an eight-hour workday, (5) occasionally climbing ramps and stairs, (6) never climbing ladders, ropes, or scaffolds, (7) occasionally balancing, stooping, or crouching, and (8) never kneeling or crawling. *Id.* The ALJ also found Claimant must avoid concentrated exposure to hazards, such as unprotected heights and dangerous machinery. *Id.* With these limits in place, the ALJ determined, Claimant would be capable of maintaining regular attendance and being punctual, within customary tolerances, and of performing activities within a schedule. *Id.*

Based on this RFC, the ALJ determined at step four that Claimant could not perform any past relevant work. (R. 30.) Finally, at step five, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could perform. *Id.* Specifically, the ALJ found Claimant could work as a coder, brake lines; polisher, eyeglass frames; taper, printed circuit layout; and hand mounter. (R. 31.)

Because of this determination, the ALJ found that Claimant was not disabled under the Act. *Id.* On December 6, 2012, Claimant sought review of the ALJ's decision. *See* R. 1. On March 10, 2014, the Social Security Appeals Council denied the request. *Id.* That denial made the ALJ's opinion into the final decision of the Commissioner. *Id. See also Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Claimant now seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Baumhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review of the ALJ's decision is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## III. ANALYSIS

Claimant asserts that the ALJ made three errors. First, Claimant argues the ALJ erred by improperly evaluating his complaints of pain. Second, Claimant contends the ALJ improperly weighed the medical opinions of Claimant's treating physicians, Dr. Towanda Harris and Dr. Samira Khattak. Third, Claimant claims that, when determining his RFC, the ALJ failed to account for Claimant's inability to use his right shoulder and his limited ability to concentrate. The Court finds that the ALJ erred in the first two respects and, therefore, need not address the third.

**1.     The ALJ Did Not Properly Evaluate Claimant's Complaints Of Pain.**

Claimant offers three reasons why the ALJ improperly evaluated his complaints of pain. Claimant first contends that the ALJ "unlawfully required that 'the objective medical evidence . . . fully substantiate the intensity, persistence, and functionally limiting effects alleged by the claimant.'" [ECF No. 11, at 5] (quoting R. 25). This argument is premised on a misreading of the ALJ's opinion.

The language with which Claimant takes issue appears in a four-sentence paragraph. The middle two sentences of that paragraph are: "As discussed in greater detail below, the claimant's treatment records indicate that he consistently reported pain and mental health complaints to his medical providers. However, the objective medical evidence does not fully substantiate the intensity, persistence, and functionally limiting effects alleged by the claimant." (R. 25.) This language describes the ALJ's appraisal of the record. As the ALJ assessed the record, the objective medical evidence did not fully substantiate Claimant's complaints of pain. Whether that assessment was correct is not relevant to Claimant's first argument. All that matters is that

5

the plain meaning of the ALJ's language shows it is meant to be a description of the ALJ's assessment of the record evidence, not an assertion as to the applicable legal standard.

This understanding is confirmed by more than just the plain meaning of the words. On the immediately preceding page of the opinion, the ALJ explained the legal standard in full. (R. 24.) The ALJ noted that an ALJ must follow a two-step process, first determining whether there is an underlying medically determinable impairment that could reasonably be expected to produce a claimant's pain or other symptoms and then evaluating the intensity, persistence, and limiting effects of those symptoms. *Id.* This is an accurate statement of the legal standard; indeed, it almost exactly mirrors Claimant's version. [ECF No. 11, at 5.] Substantively, the two are the same. This statement of the law appears in the second and third paragraphs at the start of the ruling's RFC section. (R. 24.) That is where almost every ALJ describes the relevant legal standard in almost every opinion. It is clear that is what this ALJ was doing there.

The Court does not read the ALJ's language on page 25 of his opinion as an inaccurate statement of the law. The ALJ properly described the legal standard on page 24 of his opinion. There is no reason to believe he would have repeated the legal standard just one page later. In this case, it is particularly unlikely that the language on page 25 represented the legal standard because it conflicted with the standard stated on page 24 (which was the correct standard and appeared in the same place where just about every ALJ puts the legal standard).

There is more merit to Claimant's other two arguments regarding the ALJ's analysis of his complaints of pain. Claimant asserts that the ALJ erred in evaluating his activities of daily living. Claimant notes the general and accepted point of law that daily activities are not the same as full-time work. *See Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2001). And he faults the ALJ for failing to explain how his daily

activities evidenced an ability to work. The Commissioner has not provided a substantive defense of the ALJ's handling of Claimant's daily activities. She only noted that the ALJ "considered" them. [ECF No. 19, at 11.]

In assessing Claimant's daily activities, the ALJ did not equate them with an ability to work full-time. Instead, he determined that Claimant's daily activities were not consistent with his claimed pain level. (R. 29-30.) The ALJ noted that Claimant testified he: (1) gets a bad pain if he carries a gallon of milk, talks on the phone for five minutes, or shaves; (2) cannot walk more than three blocks; (3) struggles to bend, squat, or grip; and (4) cannot stand or sit for long periods of time. (R. 25.) The ALJ found that this testimony was inconsistent with the fact that Claimant vacuumed once a month, did laundry, paid bills, cooked once a day, showered without assistance, drove short distances, and went grocery shopping with his mother and son. *Id.*

The ALJ's analysis of Claimant's daily activities was deficient. The first problem is that an ALJ has a duty to build a logic bridge between the evidence and his conclusions. *Berger*, 516 F.3d at 544. To draw a negative credibility inference from a claimant's daily activities, an ALJ must explain how his daily activities are inconsistent with his testimony. *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Here, though, the ALJ did not do that. He simply summarized some testimony, listed some daily activities, and asserted in a one-sentence conclusion that the two were inconsistent. (R. 25-26, 29-30.) That alone is error.

Moreover, Claimant's daily activities were not necessarily inconsistent with his testimony. Claimant drove places. But he only did so if those places were close in distance and time. (R. 216.) And the fact that Claimant could drive a short distance is not inconsistent with his not being able to walk more than three blocks, sit for long periods of time, and so on. Driving only seems relevant to two areas of Claimant's testimony: his characterization of his

7

ability to grip and sit. But Claimant's ability to drive short distances is not inconsistent with either. Claimant said that he can still grip things; it was just that he no longer had "the tight grip" that he used to have. (R. 72.) And driving does not require a death grip. Of course, driving involves sitting. But Claimant testified that he could sit for short periods of time—at least five minutes—without standing up. Because he did not drive places that were more than five minutes away, Claimant's testimony about his ability to sit is consistent with his driving. (R. 75.)

Shaving and showering, two other activities Claimant testified he could do without assistance, are not equivalent to carrying a gallon of milk, talking on the phone, or walking more than three blocks. They likely involve some bending, squatting, gripping, and standing. But that could be minimal. There is nothing in the record to indicate otherwise. And Claimant did not aver a complete inability to bend, squat, grip, and stand. He only said that doing so causes pain and that he cannot do so for long periods of time. His nuanced testimony about his daily activities reflects this fact. He noted that he can shower as long as he does not "trigger any sharp movements or pains" and that he can shave as long as he does not lean forward towards the mirror. (R. 70, 74.)

Claimant paid bills. He did so by going to a currency exchange that was about two blocks from his apartment. (R. 74.) Again, this daily activity is only relevant to a limited portion of Claimant's testimony, specifically that having to do with his ability to walk and stand. Claimant, however, did not have to walk more than three blocks to pay bills and he did not have to stand or sit for a long period of time to do so.

Claimant cooked. He did so once a day, mostly relying on the microwave (R. 215) and using Styrofoam plates to avoid having to wash dishes (R. 25, 73). Claimant also did laundry about once a week and vacuumed about once a month. (R. 73-74.) These daily activities likely

8

involved gripping and standing. But, as already discussed, Claimant said he could grip things and could stand for short periods of time. Nothing in the record indicates that the way he cooked demanded a greater ability to grip or to stand than what Claimant testified he could manage. And it is reasonable to imagine that these activities could be done without a tight grip and without standing for extended periods of time. These activities also may involve bending and squatting. But, again, Claimant testified that he can bend at the waist a little; he just cannot bend a lot and cannot hold the bend or reach down without causing pain. (R. 72.) Likewise, Claimant said that he can squat, but that it hurts a lot to do so. *Id.* There is nothing in the record indicating that these daily activities required more than a minimal amount of bending and squatting that would be consistent with Claimant's testimony. Simply put, the ALJ had no basis, or at least none that he articulated, to conclude that Claimant's cooking, doing laundry, and vacuuming conflicted with his nuanced testimony about what caused him to experience pain. One need not think long to imagine reasonable ways to perform each of these activities that would be entirely consistent with the testimony. Speculation cannot be used to create inconsistencies when the record reveals none.

Finally, Claimant went grocery shopping with his mother and son. (R. 76.) The grocery store was within five minutes of his apartment. (R. 75.) It is unclear from the testimony whether Claimant bought a gallon of milk when shopping and, if so, whether his mother, his son, or he carried it. Moreover, even if he were the one who carried it, that would not be inconsistent with testimony that doing so caused him pain. Perhaps he bore the pain for the short period of time necessary to put the milk in the cart, on the checkout conveyor belt, and into the car. He was not asked. Shopping also may involve bending, squatting, and griping; of course, it also will involve

9

standing. But there is nothing in the record indicating that the demands in each of these areas outstripped Claimant's testimony about his abilities.

Claimant's final argument with respect to his credibility is that the ALJ erred by drawing a negative inference from his conservative pain treatment. The ALJ determined that Claimant refused inpatient hospitalization, did not receive any treatment for his sleep apnea, had "only conservative treatment for his back and neck during the adjudication period," and did not fully comply with his psychotropic medication regimen. (R. 29.) Based on this perceived conservative treatment, the ALJ drew a negative credibility interference. *Id.* In defense of this analysis, all the Commissioner did was summarize the ALJ's findings. [ECF No. 19, at 11.]

The ALJ's consideration of Claimant's rejection of his physician's suggestion concerning inpatient hospitalization was flawed in two respects. It is far from clear in the record that Dr. Samina Khattak actually recommended that course of treatment. The doctor did note that he *offered* hospitalization for psychiatric treatment. (R. 635.) But that notation appeared in section of his report that was titled "History of Present Illness." *Id.* It did not appear in the "Course," "Plan," or "Orders" sections that appeared a few pages later. (R. 638.) Perhaps Dr. Khattak offered hospitalization because he thought Claimant would want it. Perhaps it was one of a few different but equally good courses of treatment. The record simply does not provide any indication or context. The only other insight into the matter comes from Claimant's own testimony that the doctor asked if he "wanted to be" hospitalized. (R. 79.) The ALJ should not have assumed that the doctor recommended that course of treatment above all others. Moreover, even if that was the recommended course of treatment, the ALJ still could not draw a negative credibility inference before considering Claimant's reason for not following it. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013). Here, Claimant testified that he could not be hospitalized

10

because he was a single parent and could not leave his son alone. (R. 79.) The ALJ did not adequately consider that explanation.

The ALJ noted that Claimant did not complete a full-night CPAP titration, without which Claimant could not be issued a positive airway pressure device to help with his sleep apnea. (R. 27.) Claimant contends that he did not undergo this test because the doctors told him that he needed to use the machine for more than five hours and he does not sleep for that long. (R. 64.) This explanation may be completely meritless. Perhaps Claimant sleeps longer than five hours. Perhaps the machine can produce a reading in less than five hours. But the ALJ never analyzed Claimant's proffered rationale for his failure to complete a full-night CPAP titration. That means, even if the rationale was faulty, the ALJ still would have erred.

Finally, Claimant challenges the ALJ's finding that he had only "conservative treatment for his back and neck during the adjudication period." The ALJ did not list what specific treatment Claimant should have gotten when he made this general statement. But he made comments throughout his opinion indicating where he thought Claimant fell short. For instance, the ALJ noted that one of Claimant's doctors, Dr. Caleb Lippman, referred Claimant to physical therapy and an orthopedic surgeon. Claimant had not begun therapy and had not seen the surgeon at the time of the hearing. Although not entirely clear, it appears that this is part of the "conservative treatment" regimen with which the ALJ found fault. There was a reason, though, why Claimant did not seek physical therapy. According to his testimony, Claimant had to arrange for transportation to the physical therapist and was taking the necessary steps to do so. (R. 68-69, 81-82.) Perhaps he was not moving as quickly as he could have moved. But the ALJ cannot speculate about such a fact; instead, he must elicit the necessary explanation. In this case,

11

the ALJ did not identify anything in the record that showed Claimant could have fixed the transportation issue before the date of the hearing.

At other points in the opinion, the ALJ noted with respect to Claimant's back and neck pain that he "would expect the claimant to make a greater effort to seek more aggressive treatment to alleviate his symptoms if they were as severe as alleged." (R. 26.) *See also* R. 25. In many of these instances, however, the ALJ never described what additional treatment that Claimant should have sought. The ALJ's opinion in the air, with nothing to pin it to, is not a proper basis for a negative credibility inference. In other words, the ALJ failed to explain how Claimant's course of treatment fell below that which he should have followed and to account for Claimant's explanations for his treatment decisions. The Court is not expressing an opinion as to whether there is substantial evidence that Claimant's course of treatment was conservative. Rather, it is the ALJ's failure to build a logical bridge from that supposedly conservative treatment to a negative credibility finding that merits remand.

For all of these reasons, the Court finds that the ALJ's analysis of Claimant's credibility was sufficiently flawed in this case to justify remand.

2.  **The ALJ Did Not Properly Evaluate The Medical Opinions Of Dr. Harris And Dr. Khattak.**

Claimant takes issue with the ALJ's treatment of the opinions of Dr. Towanda Harris and Dr. Samira Khattak, two of Claimant's treating physicians.

Dr. Harris was one of Claimant's primary care physicians. Dr. Harris provided both a letter and a medical source statement ("MSS"). The ALJ's gave the former little weight, and Claimant does not dispute this decision. The ALJ did not specify exactly how much weight he gave to Dr. Harris's MSS. The ALJ stated that he agreed with the lifting and carrying limits in the MSS. (R. 29.) But he also said that "there is no evidence" that supports the sitting, standing,

walking, and focusing limitations. *Id.* The ALJ did not explain this assertion; instead, it was contained in a lone, conclusory sentence.

The ALJ's conclusion is not supported by the record. Claimant's treatment notes from Chicago Family Health Care, where Dr. Harris worked, document chronic neck and back pain dating back to 2009. *See, e.g.,* R. 323-335, 443-448, 485. They demonstrate a consistent attempt to craft a medication regime that would help Claimant. *Id.* They also depict the battle to try to find other methods of coping, such as physical therapy and injections. *Id.* On January 3, 2012, Dr. Harris examined Claimant. Dr. Harris noted both chronic pain and several other chronic conditions, including bipolar disorder, lumbago, hypertension (unspecified), migraine, and other and unspecified hyperlipidemia. (R. 532.) The examination revealed a "passive painful range of motion," specifically describing pain that resulted from turning to the left and extending the neck. (R. 533.) Motor tests revealed back pain. *Id.* Many of these same conditions were described in the notes memorializing a March 19, 2012 office visit. (R. 535.) The following month, a foot and ankle exam revealed "pain to palpation right heel." (R. 539.) The chronic pain was again documented in accompanying treatment notes. (R. 541.) The same was true over the next few months. (R. 624, 628, 631.)

The treatment notes reveal that Claimant was in significant, constant pain involving his neck, back, and legs. This type of pain is consistent with a limited ability to sit, stand, walk, and focus. It is true that the notes do not tie Claimant's pain to specific limitations in these areas. But an ALJ cannot play doctor by parsing medical notes that are consistent with a doctor's opinion in a search for nonexistent inconsistencies. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000), *as amended* (Dec. 13, 2000). Moreover, if the ALJ believed that deficiencies in Dr. Harris's notes impaired his ability to

13

assess Dr. Harris's medical opinion, the ALJ may have had a duty to seek out additional information. *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable."). Finally, even if the ALJ were correct in his assessment of Dr. Harris's treatment notes, simply dismissing them in a solitary conclusory sentence would not be enough to build the necessary logical bridge.

The Commissioner does defend the ALJ's "no support in the records" rationale for dismissing Dr. Harris's opinion. But, in doing so, she adds nothing new. Instead, the Commissioner simply parrots the ALJ's discussion of Dr. Harris's opinion. [ECF No. 19, at 6-7.] The Commissioner also presents a new point not raised by the ALJ. Specifically, the Commissioner contends that Dr. Harris's limitations "were based on the claimant's subjective complaints . . . ." *Id.* at 6. But the ALJ only found that Claimant's testimony about problems with reading and watching a movie were subjective complaints. (R. 29.) He did not find that the information underlying Dr. Harris' opinion was based on subjective complaints. Therefore, *Chenery* precludes the Commissioner from advancing this argument. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015).

Dr. Samina Khattak, Claimant's treating psychiatrist, also provided a medical opinion in the form of a Mental Residual Functional Capacity Assessment. The ALJ did not specify what weight he gave this opinion. The ALJ stated generally that "the evidence does not support" the limitations in Dr. Khattak's opinion. Again, however, this determination falls prey to the same errors that the Court discussed with respect to Dr. Harris's opinion. As with Dr. Harris, Dr. Khattak's treatment notes reflect that Claimant had impairments that were consistent with the doctor's opinion. For instance, Dr. Khattak routinely noted that Claimant was depressed,

obsessed about negative developments, and lacked interest in doing things. *See, e.g.,* (R. 469, 501, 505, 509, 557, 561.) He diagnosed Claimant with significant mental conditions, including depression and bipolar disorder. *Id.* Every single treatment note characterized Claimant's psychiatric problems as "moderate." (R. 470, 502, 506, 557, 561, 565, 613.) And Dr. Khattak consistently reported a GAF score of 50 for Claimant, which is on the borderline between the severe and moderate impairment range. (R. 471, 504, 508, 567.) Therefore, the ALJ's assessment that the evidence did not support Dr. Khattak's opinion is not consistent with the record.

In discussing Dr. Khattak's opinion, as noted above, the ALJ also noted that Claimant did not submit to inpatient hospitalization even though Dr. Khattak offered it, and that Claimant should have sought more treatment if he had the limitations contained in Dr. Khattak's opinion. Essentially, these rationales hold Dr. Khattak's medical judgment hostage to Claimant's supposed failure to seek treatment. This is an improper rationale for at least two reasons. Most importantly, as described above, the ALJ did not adequately assess what treatment Claimant forewent that he should have obtained. Further, the ALJ did not explain how Claimant's decision not to seek treatment showed that Dr. Khattak's medical opinion with respect to his underlying condition should be given less weight.

For all of these reasons, the Court concludes that the ALJ erred in weighing the medical opinions of Claimant's treating physicians.

### IV. CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment [ECF No. 10] is granted, and the Commissioner's motion for summary judgment [ECF No. 18] is denied. The

decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: July 11, 2016